FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT, E.D.N.Y.
★ APR 1 7 2006 ★
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------- X

MARY PICKERING, as Administratix of the Estate of
CHARMENE PICKERING, deceased,

                        Plaintiff,

    -against-

SAMUEL MERCADO,
                        Defendant.

----------------------------------------------------------------- X

03 CV 5654 (ARR)

NOT FOR PRINT OR
ELECTRONIC
PUBLICATION

OPINION AND ORDER

ROSS, United States District Judge:

In this action, plaintiff Mary Pickering ("plaintiff") brings suit on behalf of the decedent, her granddaughter Charmene Pickering ("Charmene Pickering"), against defendant New York State Police Investigator Samuel Mercado ("defendant") pursuant to 42 U.S.C. § 1983. Specifically, plaintiff alleges that defendant, in the course of arresting another individual, shot and killed Charmene Pickering, violating her Fourth Amendment right to be free from unreasonable seizures and her substantive due process rights under the Fourteenth Amendment. In addition to these constitutional claims, plaintiff brings state law claims of negligence and wrongful death against defendant. At this time, the court considers defendant's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, defendant's motion is granted.

## BACKGROUND

Unless otherwise noted, the parties do not contest the following facts. In 2001, defendant, a senior investigator with the New York State Police ("NYSP"), participated in a joint

1

task force, involving the NYSP, Drug Enforcement Administration ("DEA"), the New York Department of Parole ("NY DOP"), and the Schenectady Police Department ("Schenectady PD"), to conduct a narcotics investigation in the Schenectady area. Def. Rule 56.1 Stmt. ¶¶ 1, 7. After several months of investigation, which resulted in information gathered from confidential informants, the task force established an arrest team to effect the arrests of two suspected drug dealers, Cheryl Pickering ("Cheryl Pickering")[1] and John Alston ("Alston"), at their home at 810 East 22nd Street in Brooklyn, New York. Id. ¶¶ 31, 34, 36. The arrest team also intended to arrest Carlos Alfonso Rodas ("Rodas"), whose identity was not known at the time of the arrest, at the same location pursuant to information obtained from one of the confidential informants.[2] According to the informant, Cheryl Pickering's source of supply was a Colombian male, who the authorities later learned was Rodas, known to drive a blue late-model Toyota Camry and believed to be armed. Id. ¶¶ 23-24.

In addition to members of the DEA and the Schenectady PD, the arrest team consisted of six members of the NYSP, including defendant, Senior Investigators J.J. O'Connor ("O'Connor") and Donald Wilkinson ("Wilkinson"), Investigators Anna Villanueva ("Villanueva") and Gordon Pieruzzi ("Pieruzzi"), and Trooper Mary Beth Horn ("Horn"). Id. ¶ 32. Defendant was in charge of the six-member NYSP team. Id. ¶¶ 9, 45. The arrest team intended to secure Rodas's presence at Cheryl Pickering's house by having the confidential informant call Cheryl Pickering to purchase heroin, which would then result in Rodas driving to

---

[1] Cheryl Pickering was later found to be the mother of the decedent Charmene Pickering. Def. Rule 56.1 Stmt. ¶ 6.

[2] The identity of the confidential informant remains confidential pursuant to stipulation and protective order dated October 5, 2004.

Cheryl Pickering's home to supply her with the requested drugs. Id. ¶ 31. According to the plan, the informant would then call Cheryl Pickering to cancel the pick up due to car trouble. Id. The arrest team intended to use four vehicles to block Rodas's car—two in the front, two in the back—as he was leaving the premises with the heroin shipment still in possession. Id. ¶¶ 16-18, 30-31.

On July 26, 2001, the arrest team executed its plan to arrest Cheryl Pickering, Alston, and Rodas. As the arrest team traveled from Albany to Brooklyn, the confidential informant placed a call to Cheryl Pickering to inform her that he was on his way to pick up the drugs. Id. ¶ 38. The arrest team arrived near Cheryl Pickering's house around 2:30pm. Id. ¶ 41. Two law enforcement vehicles were positioned on each side of the "T" intersection of East 22nd Street and Campus Road. Id. ¶ 45. Defendant and Wilkinson were in one forward vehicle, and Villanueva and O'Connor were in another forward vehicle on the opposite side of the road. Id. ¶ 52. Pieruzzi and Horn were positioned in a rear vehicle on Campus Road, as was the fourth vehicle with the DEA agents and the Schenectady PD officer. Id. At this time, the surveillance team, which was already observing Cheryl Pickering's house, informed the arrest team that a Hispanic male had entered the house and his blue late-model Toyota Camry was parked in front of the house. Id. ¶ 44. Shortly thereafter, the surveillance team informed the arrest team that an unidentified black female was approaching and entering the residence. Id. ¶ 55. At approximately 3:02pm, the confidential informant called Cheryl Pickering to tell her that he would have to cancel the pick up because his car had broken down. Id. ¶¶ 56-57. At approximately 3:25pm, the surveillance team informed the arrest team that Rodas was observed

3

exiting the house with the unidentified woman and that both individuals were observed entering Rodas's car. Id. ¶ 57.

The surveillance team then informed the arrest team that the vehicle, with Rodas in the driver's seat and the unidentified woman in the passenger's seat, was proceeding down East 22nd Street and turning on Campus Road. Id. ¶ 59. Shortly thereafter, defendant observed Rodas turn onto Campus Road. Id. ¶ 60. The forward vehicles then pulled to either side of Rodas's car and blocked his progress in a V-formation. Id. Defendant and the other officers exited their vehicles and approached Rodas's vehicle, identifying themselves as police and giving commands to the vehicle's occupants. Id. ¶¶ 61-62.

Villanueva had exited her vehicle with her gun drawn and approached the passenger side of Rodas's vehicle. Speaking in English only, she stated, "Police, don't move." Def. Rule 56.1 Stmt. ¶ 64; Pl. Rule 56.1 Stmt. ¶ 64. Charmene Pickering complied with Villaneuva's instruction and remained seated in the passenger seat. Def. Rule 56.1 Stmt. ¶ 64.

Defendant, approaching the front driver's side bumper of Rodas's vehicle, Def. Rule 56.1 Stmt. ¶ 63, initially gave commands English, stating "put your hands out the window, put your hands where I can see them, stop the vehicle." Johnson Decl. Ex. A at 110 ("Mercado Dep."). It is undisputed that Rodas does not speak or understand English. Def. Rule 56.1 Stmt. ¶ 63. Defendant testified that as he got closer to the vehicle, he recognized that the driver was of Hispanic descent and starting giving instructions in both English and Spanish. Mercado Dep. at 123-24. Rodas, in contrast, testified that all commands at that time were given in English. Pl. Rule 56.1 Stmt. ¶ 62. Neither Villaneuva nor O'Connor recall any instructions being given in

4

Spanish. Id. In addition, other officers were also giving commands simultaneously, and none of those commands were in Spanish. Id.

Defendant testified that, although he had observed Rodas's hands on the steering wheel as he was approaching the car, he could no longer see them after he stopped at the front bumper of the car. Def. Rule 56.1 Stmt. ¶ 65. O'Connor, Villaneuva, and Wilkinson, however, testified that they could observe Rodas's hands at this point. Pl. Rule 56.1 Stmt. ¶ 65. In addition, Rodas testified that his hands were on the steering wheel for the duration of the incident. Id. Defendant further testified that he then drew his gun and approached the driver's side door of Rodas's car. Def. Rule 56.1 Stmt. ¶ 66. According to defendant, he held his gun in his right hand with his finger on the slide. Id. ¶¶ 67-68. At this point, Rodas was still not complying with defendant's order to show his hands and exit the vehicle. Id. ¶ 69.

Defendant then opened the driver's side door and observed Rodas lowering his hands to his sides. Id. ¶ 71. Villanueva observed Rodas move his hands to his lap and toward the center console at one point. Id. ¶ 72. Rodas, however, testified that he never moved his hands throughout the duration of the incident. Pl. Rule 56.1 Stmt. ¶ 73. At this point, defendant observed Wilkinson place his left hand in the vehicle to pull Rodas out of the car. Def. Rule 56.1 Stmt. ¶ 73. Also attempting to extricate Rodas from the car, defendant—holding his gun in his right hand near his right shoulder—reached into the car with the left side of his body and released Rodas's seatbelt. Id. ¶ 74. Defendant then grabbed Rodas's shirt with his left hand and pulled Rodas out of the car. Id.

It is undisputed that defendant's gun went off at some point while defendant was attempting to pull Rodas from the car. Defendant does not claim that his gun malfunctioned and,

in fact, an inspection of the gun established that the gun was not defective. Id. ¶ 80. Defendant claims that he does not know if he pulled the trigger of his gun or, if he did, how it happened. Id. Defendant's expert, Urey R. Patrick, and plaintiff's expert, Henry Blanche, agree that in order for defendant to have depressed the trigger, his finger would have to be placed inside the trigger guard, not on the slide. Pl. Rule 56.1 Stmt. ¶ 85. Defendant maintains that his finger was on the slide during the entire episode, Def. Rule 56.1 Stmt. ¶ 80, but he also admitted that there was no other means for firing his gun except depressing the trigger. Pl. Rule 56.1 Stmt. ¶ 80. He also claims that Rodas's left hand unintentionally hit defendant's right hand, which was holding the gun, as Rodas was being pulled from the car. Def. Rule 56.1 Stmt. ¶ 79. According to other officers on the scene, however, Rodas was shot as defendant leaned into the vehicle to release Rodas's seatbelt, thus, Rodas was still seated in the car at the time of the shooting. Pl. Rule 56.1 Stmt. ¶ 79.

The bullet discharged from defendant's gun grazed Rodas's shoulder and hit the left side of Charmene Pickering's neck. Def. Rule 56.1 Stmt. ¶¶ 84, 85, 87. Still positioned at the passenger side door, Villaneuva heard the gunshot and felt shattered glass from the passenger side window. Id. ¶ 82. Charlene Pickering was removed from the vehicle and taken to the emergency room where she was pronounced dead on arrival. Id. ¶ 107.[3]

Plaintiff, who is represented by counsel, filed her complaint on November 7, 2003. Discovery was completed on November 30, 2005. See Order dated October 14, 2005. Defendant moved for summary judgment on January 6, 2006.

---

[3] Although she was pronounced dead on arrival, Charmene Pickering was resuscitated and placed on a ventilator. Def. Rule 56.1 Stmt. ¶ 108. She was removed from the ventilator on August 1, 2001 after her mother gave consent for her organs to be donated. Id.

# DISCUSSION

I.  Standard for Summary Judgment

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper if the pleadings, depositions, answers, interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. Proc. 56(c). An issue of fact is genuine when "a reasonable jury could return a verdict for the nonmoving party," and facts are material to the outcome of the litigation if application of the relevant substantive law requires their determination. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). The moving party has the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." Celotex Corp. v. Cartrett, 477 U.S. 317, 323 (1986). The substantive law determines the facts that are material to the outcome of a particular litigation. See Anderson, 477 U.S. at 250; Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1320 (2d Cir. 1975). In determining whether summary judgment is appropriate, a court must resolve all ambiguities, and draw all reasonable inferences against the moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)).

If the moving party meets its burden, the burden then shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. Proc. 56(e). The non-moving party must "do more than simply show there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. "[T]he mere existence of some

alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson, 477 U.S. at 247-48. Only when it is apparent that no rational finder of fact "could find in favor of the non-moving party because the evidence to support its case is so slight" should summary judgment be granted. Gallo v. Prudential Residential Servs. Ltd. Partnership, 22 F.2d 1219, 1223 (2d Cir. 1994).

II.  Plaintiff's Claims

A.  Section 1983 Claims

1)  *Fourth Amendment Claim*

Defendant moves for summary judgment on plaintiff's claim that defendant used excessive force against Charmene Pickering, in violation of her Fourth Amendment right to be free from unreasonable seizures, by shooting and killing her as he was attempting to arrest Rodas. Defendant argues that plaintiff has failed to establish that Charmene Pickering was "seized" for the purposes of the Fourth Amendment where, at most, plaintiff can only show that she was the unintended victim of a shooting intended for Rodas. Defendant further argues that no reasonable juror could find that the shooting was intentional and, thus, the shooting does not rise to the level of a constitutional violation. Plaintiff argues that the shooting, whether accidental or deliberate, was highly reckless with regard to Charmene Pickering and, thus, constitutes a violation of her right to be free from unreasonable seizure.

The Fourth Amendment protects against unreasonable seizures. See Graham v. Connor, 490 U.S. 386, 395 (1989). "[T]he first step in any Fourth Amendment claim ... is to determine whether there has been a constitutionally cognizable seizure." Medeiros v. O'Connell, 150 F.3d

164, 167 (2d Cir. 1998) (citing Michigan v. Summers, 452 U.S. 692, 696 (1981)). A shooting may constitute a seizure for Fourth Amendment purposes. See Tennessee v. Garner, 471 U.S. 1, 7 (1985). However, the conduct at issue must be purposeful to rise to the level of a Fourth Amendment violation. In Brower v. County of Inyo, the Supreme Court explained that a Fourth Amendment "seizure" "requires an intentional acquisition of physical control" and only occurs when the "detention or taking itself [is] willful." 489 U.S. 593, 596. The Court further explained:

> [A] Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent passerby), nor even whenever there is a governmentally caused and governmentally desired termination of an individual's freedom of movement (the fleeing felon), but only when there is a governmental termination of freedom of movement through means intentionally applied.

Id. at 587-98 (emphasis in original).

Applying this standard, the Second Circuit has concluded that a police officer's accidental shooting of a hostage during efforts to retrieve the hostage from the hostage-taker does not constitute a seizure under the Fourth Amendment. Medeiros, 150 F.3d at 168. The Second Circuit explained that the "where the hostage is hit by a bullet intended for the hostage-taker, the mishap is the 'unintended consequence[] of government action,' and the governing principle is that such consequences cannot 'form the basis for a fourth amendment violation.'" Id. at 169 (quoting Ansley v. Heinrich, 925 F.2d 1339, 1344 (11th Cir. 1991)). Similarly, courts have held that the fact that a bystander is injured or killed as a consequence of shootings by law enforcement officers does not constitute a seizure under the Fourth Amendment. See Rucker v. Hartford County, 946 F.2d 278, 281 (4th Cir. 1991) (concluding that the Fourth Amendment

9

provides no protection to an innocent bystander against being unintentionally injured by police officers trying to apprehend fleeing criminal suspect); Hickey v. City of New York, No. 01 Civ. 6501, 2004 WL 2724079, at *14 (S.D.N.Y. Nov. 29, 2004) (concluding that the Fourth Amendment provides no protection to a bystander, who was allegedly injured when glass of storm door shattered after an officer fired his weapon at a criminal suspect). However, courts have also found that the shooting of a fleeing suspect implicates the Fourth Amendment, even when he is not the specific intended target of the shooting. See Vaughan v. Cox, 343 F.3d 1323, 1328-29 (11th Cir. 2003) (finding that the passenger of a vehicle, who was hit by a bullet intended to disable the vehicle, was "seized" for Fourth Amendment purposes because he and the driver were suspects and the bullet was intended to stop both the passenger and the driver by disabling the vehicle); Ivory v. City of Minneapolis, No. Civ. 02-4364, 2004 WL 1765460, at *3-4 (D. Minn. Aug. 4, 2004) (same).

The court notes that plaintiff makes no claim that defendant intentionally shot Charmene Pickering. Instead, plaintiff claims that defendant intentionally shot one bullet at Rodas, which hit Charmene Pickering on the left side of her neck and caused her death. Def. Mem. at 15-16. Given that plaintiff concedes that the shooting, if intentional, was meant for Rodas, the court could end its inquiry here and conclude that plaintiff fails to state a claim under the Fourth Amendment because Charmene Pickering's tragic death was the "'unintended consequence[] of government action,'" which is insufficient to "'form the basis for a fourth amendment violation.'" Medeiros, 150 F.3d at 169 (quoting Ansley, 925 F.2d at 1344). However, in spite of plaintiff's concession, the court will review the record to determine whether, drawing all

10

inferences in favor of the plaintiff, a reasonable juror could find that the shooting was intended to limit Charmene Pickering's freedom of movement.

It is undisputed that on July 26, 2001, law enforcement officials intended to arrest Cheryl Pickering, Alston, and Rodas. See Def. Rule 56.1 Stmt. ¶¶ 23, 34. While the surveillance team notified the arrest team that an unidentified woman, later found to be Charmene Pickering, entered the passenger side of Rodas's vehicle, they provided no further information about the woman to the arrest team. See id. ¶ 55. Thus, at the time the arrest team used their vehicles to block Rodas's vehicle, they had no information about Charmene Pickering and had no reason to believe that she was involved in any criminal activity. The only facts they had about Charmene Pickering were that she had been in the home of the arrest targets Cheryl Pickering and Alston moments before and was in the passenger seat of the car driven by the third arrest target, Rodas. The record demonstrates that, in spite of the fact that law enforcement officials had little or no knowledge of the passenger in Rodas's car, members of the arrest team proceeded with their plan to block Rodas's car and approached both the driver and passenger sides of the car with guns drawn. Id. ¶¶ 61-62, 64. Viewing the evidence in the light most favorable to plaintiff and drawing all reasonable inferences against defendant, it is clear that, at this point in the arrest operation, members of the arrest team intended to detain Charmene Pickering.

However, after this point, the record clearly demonstrates that Charmene Pickering was detained by the arrest team. In fact, Villanueva, the NYSP investigator in the position closest to Charmene Pickering, testified that Charmene Pickering obeyed her instructions to remain seated

11

in the car.[4] Id. ¶ 64. There is no evidence in the record showing that she was resisting arrest or doing anything that would require law enforcement officials or defendant, in particular, to restrain her. Moreover, the evidence overwhelmingly shows that defendant's focus was on Rodas. Defendant approached the driver's side of the car where Rodas was seated. Id. ¶ 67. While the visibility of Rodas's hands is disputed, see Pl. Rule 56.1 Stmt. ¶ 65, it is undisputed that defendant was observing Rodas as he approached the driver's side. See Def. ¶¶ 65, 68-69. It is also undisputed that defendant believed that Rodas was not complying with his orders to put his hands out the window and leave the vehicle. See id. ¶ 69. At the time of the shooting, defendant had leaned into the vehicle with the left side of his body to release Rodas's seatbelt and attempt to pull him out of the car. Id. ¶ 74; Pl. Rule 56.1 Stmt. ¶ 74. Viewing the evidence in the light most favorable to plaintiff and drawing all reasonable inferences against defendant, it is clear that defendant approached the car with the purpose of detaining Rodas and that his actions were focused on first securing Rodas's cooperation in leaving the car and then forcibly removing Rodas from the car. Thus, assuming that defendant intentionally shot his gun,[5] no

---

[4] Defendant stated that he had observed that Charmene Pickering had not moved from the passenger seat and, thus, was not obeying police instructions to exit the vehicle. See Pl. Rule 56.1 Stmt. ¶ 86 (citing Ross Decl. Ex. G at 138 ("Mercado Police Investigation Statement")). Although defendant's statement shows that he believed that Charmene Pickering was not following police instructions, it does not demonstrate that there was any reason for him to restrain her by firing his weapon. In fact, his other statements, which are not disputed by plaintiff, indicate that he believed that other officers were responsible for the passenger of the vehicle. See Mercado Police Investigation Statement at 138 ("[M]y focus was really on the driver because I knew we had individuals that were already walking up to the passenger side.")

[5] At his deposition, Rodas testified that defendant pointed his gun at Rodas's forehead, then shot him in the shoulder, and released his seatbelt before pulling him out of the car. Ross Decl. Ex. B at 30-31 ("Rodas Deposition"). Plaintiff's expert concluded, however, that "[defendant] did not intend to shoot Rodas or [Charmene] Pickering" and that defendant's "unsafe and reckless handling of his firearm, and his repeated violation of regulations, are what

12

reasonable juror could conclude that defendant intended to shoot Charmene Pickering to terminate her freedom of movement.

Accordingly, the court concludes that summary judgment is appropriate on plaintiff's Fourth Amendment claim because there is simply no evidence in the record establishing that Charmene Pickering was the intended object of the force exerted by defendant. While plaintiff has no recourse under the Fourth Amendment, her claim is more appropriately analyzed as a substantive due process claim under the Fourteenth Amendment. See County of Sacramento v. Lewis, 523 U.S. 833, 844-45 (1998) (finding that high-speed police pursuit that accidentally stopped the suspect's car by crashing into it does not implicate the Fourth Amendment and should be analyzed as a substantive due process claim); Claybrook v. Birchwell, 199 F.3d 350 (6th Cir. 2000) ("[C]onstitutional tort claims asserted by persons collaterally injured by police conduct who were not intended targets of an attempted official "seizure" are adjudged according to substantive due process norms."); Medeiros, 150 F.3d at 169 (noting that "where no seizure within the meaning of the Fourth Amendment has taken place, substantive due process analysis is appropriate").

---

made this shooting occur." See Ross Decl. Ex. K at 13 ("Blanche Affidavit"). Moreover, defendant denies that he deliberately pulled the trigger of his gun and maintains that his finger was on the slide of the gun, not in the trigger guard, at the time of the shooting. See Def. Rule 56.1 Stmt. ¶ 80. While plaintiff's evidence with regard to defendant's intent is somewhat inconsistent, the court views the evidence in the light most favorable to plaintiff and draws all reasonable inferences against defendant for the purposes of summary judgment. Consequently, the court analyzes plaintiff's claims under the assumption that the shooting was intentional.

2)  *Substantive Due Process Claim*

Defendant also argues that summary judgment is appropriate for plaintiff's substantive due process claim because defendant's conduct was, at most, reckless and, thus, fails to meet the "shock the conscience" standard for imposing constitutional liability.

The Supreme Court has repeatedly emphasized that "'[t]he touchstone of due process is the protection of the individual against arbitrary action of government.'" County of Sacramento, 523 U.S. at 845 (quoting Wolff v. McDonnell, 418 U.S. 539, 558 (1974)). "Alleged abuses of the police power are sufficiently arbitrary to rise to constitutional magnitude only when the conduct at issue 'shocks the conscience.'" Medeiros, 150 F.3d at 170 (quoting County of Sacramento, 523 U.S. at 846-47); see also Rochin v. California, 342 U.S. 165, 172-73 (1952) (holding that government action that "shocks the conscience" and transgresses the "decencies of civilized conduct" constitutes a violation of due process). Although it is acknowledged that "the measure of what is conscience shocking is no calibrated yard stick," County of Sacramento, 523 U.S. at 847, "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." Id. at 849 (citing Daniels v. Williams, 474 U.S. 327, 331 (1986)) (emphasis added). Mere negligence by government officials is not cognizable as a substantive due process claim, and recklessness or gross negligence has only occasionally been sufficient. See id. at 849-50 (compiling cases). Moreover, recklessness or gross negligence by government officials may shock the conscience "when actual deliberation is practical," id. at 851, but not "when unforeseen circumstances demand an officer's instant judgment." Id. at 853. Thus, in County of Sacramento, the Supreme Court concluded that a reckless or grossly negligent high-speed police pursuit did not give rise to

a substantive due process claim because it involved "instantaneous behavior" where "the officer's instinct was to do his job as a law enforcement officer, not to induce [the suspect's] lawlessness, or to terrorize, cause harm, or kill" and "there was no reason to believe that [the officer's conduct was] tainted by an improper or malicious motive." Id. at 855; see also Medeiros, 150 F.3d at 170 (holding that officer's accidental shooting of hostage while attempting to apprehend the hostage-taker did not violate the hostage's due process rights because there was clearly no evidence of malice toward the hostage).

Here, it is undisputed that the entire incident took place in a matter of seconds. See Def. Rule 56.1 Stmt. ¶ 90. The record shows that defendant believed that Rodas was armed based on information gathered from a confidential informant and his own experience investigating drug dealers. Id. ¶ 24. Moreover, it is undisputed that Rodas did not put his hands outside the car and exit the vehicle and, thus, apparently did not follow defendant's instructions. See id. ¶ 63; Pl. Rule 56.1 Stmt. ¶ 65. The reason for Rodas's failure to obey the defendant's orders is immaterial. The fact remains that defendant was faced with a situation where he believed that Rodas was armed and Rodas was disobeying his instructions. Viewing the evidence in the light most favorable to the plaintiff and drawing all reasonable inferences against defendant, it is clear from that defendant faced a split-second decision and acted with law enforcement purposes in mind when he decided to forcibly remove Rodas from the vehicle.

Given that defendant faced a split-second decision, which involved balancing the rights of the occupants of the vehicle with the public safety concern of having a potentially armed suspect refusing to obey police orders, no reasonable juror could find that defendant's conduct "shocked the conscience." As discussed in detail above, no evidence has been adduced, nor has plaintiff

even claimed, that it was defendant's intent to restrain Charmene Pickering, rather than Rodas, when he fired his weapon. At most, assuming that defendant intentionally fired his weapon, a reasonable jury could conclude that defendant acted recklessly with regard to Charmene Pickering when he fired at Rodas. However, "because the police must act in high-tension situations, 'in haste, under pressure, and frequently without the luxury of a second chance,' even an intermediate level of fault, such as recklessness, is not enough to impose constitutionally liability." Medeiros, 150 F.3d at 170 (quoting Whitley v. Albers, 475 U.S. 312, 320 (1986)). Thus, although Charmene Pickering's death was tragic and perhaps even avoidable had defendant had time to plan his approach to removing Rodas from the vehicle, defendant's recklessness with regard to Charmene Pickering's life is insufficient to sustain plaintiff's due process claim as a matter of law. Accordingly, the court grants defendant's motion for summary judgment on plaintiff's Fourteenth Amendment claim.

B.   State Law Claims

Defendant argues that, should the court dismiss plaintiff's federal law claims, the court should decline to exercise supplemental jurisdiction over plaintiff's state law claims of negligence and wrongful death. The court agrees. Supplemental or pendent jurisdiction is a matter of discretion, not of right. See United Mine Workers v. Gibbs, 383 U.S. 715, 715-26 (1966). Where all federal claims have been dismissed before trial, pendent state claims should be dismissed without prejudice and left for resolution by the state courts. See 28 U.S.C. § 1367(c)(3); Giordano v. City of New York, 274 F.3d 740, 754 (2d Cir. 2001) (collecting cases). Because the court has dismissed plaintiff's federal law claims, it declines to exercise supplemental jurisdiction over plaintiff's state law claims.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is granted in its entirety. The court declines to exercise supplemental jurisdiction over plaintiff's state law claims and, thus dismisses plaintiff's negligence and wrongful death claims without prejudice. Plaintiff's action is therefore dismissed. The Clerk of the Court is directed to enter judgment accordingly.

SO ORDERED.

_____
Allyne R. Ross
United States District Judge

Dated: April 11, 2006
Brooklyn, New York

## SERVICE LIST

*Plaintiff's Counsel:*

James F. Ross
Ross & Hill
16 Court Street, Suite 2403
Brooklyn, NY 11241


*Defendant's Counsel:*

Susan Hull Odessky
NYS Office of the Attorney General
120 Broadway
New York, NY 10271